**SMYTH, SANFORD & GERARD, Inc., v.**
**MISSOURI-KANSAS-TEXAS R. CO.**
**et al.**
**No. 449.**

Circuit Court of Appeals, Second Circuit.
July 31, 1934.

Hines, Rearick, Dorr & Hammond, of New York City (A. C. Rearick and Archie O. Dawson, both of New York City, of counsel), for appellants.

Van Sinderen Lindsley, of New York City, for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This action is by the plaintiff, an insurance broker for the defendants, to recover damages against them because of their failure to accept an insurance policy, which they had ordered from the plaintiff, whereby the latter lost commissions which it would have been paid by the insurance company had the policy been accepted. The policy insured the defendants' tank cars and their contents and covered a risk of $600,000 of a specialized type. The jury returned a special verdict of $3,750 for the plaintiff upon which a judgment for $3,778.25 was directed, from which the defendants have appealed.

The plaintiff is a corporation doing an insurance brokerage business. It was retained by the defendant railroads in placing their insurance. Although the plaintiff acted as broker for the railroads, its commissions were paid by the companies underwriting the insurance and were based on the premiums which they received. There was no agreement for the payment of commissions made with the railroads.

There were only two markets in which this type of insurance would be written other than mutual companies, which had refused to write it. These two markets were syndicates, each composed of a number of separate insurance companies. The negotiations for placing insurance were conducted by the broker with the manager of the syndicate who had power to issue the policies. One syndicate was the Railway Underwriters, whose principal place of business was in Chicago, known as the Western Syndicate; the other was the Railroad Insurance Association, having its principal office in New York, known as the Eastern Syndicate. The Hartford Fire Insurance Company and the Insurance Company of North America were members of each syndicate.

Plaintiff began doing business as broker for these defendants in 1926. In 1929, San-

ford, the representative of the plaintiff corporation, had secured a tank car policy for $600,000 with a limitation as to any one fire of $50,000. The policy had an "Adjustment Premium Clause" which provided that, if the losses did not exceed a certain percentage of the premium, a partial refund of the premium would be made. It expired on January 23, 1931, and was issued by the Insurance Company of North America on behalf of the Western Syndicate, and contained a noncancellation clause. The premium was $37,500, and, under the "Premium Adjustment Clause," the defendants received a refund of premium amounting to $9,375. Substantial refunds had been allowed on the premiums for preceding years. Sanford also secured from the Western Syndicate an additional policy (the premium for which was $3,500) to cover losses of more than $50,000 from any one fire.

On December 4, 1930, Sanford wrote to Sherwin, the insurance commissioner of the defendants, that plaintiff was "renewing line of $600,000 covering tank cars and contents anywhere on the line, to take the place of line which will expire on January 23rd. We will use our best endeavors to get a reduction in the present premium, and will advise you if we are successful."

On December 22, 1930, plaintiff wrote Sherwin that the Western Syndicate would renew $600,000 insurance for the tank cars and contents, premium $37,500 annually, or two and one-half times such amount if written for three years. He added that they would renew it under the same form without the adjustment of premium clause at an annual rate of $33,600 or two and one-half times for three years. He also said that, if there were no further losses on the line between that time and the expiration of the policy, the defendants would get a rebate of 25 per cent. of the existing premium. These communications were made after an interchange of three letters and two telephones between the plaintiff and the Western Syndicate in which the former was attempting to get lower insurance rates. The plaintiff had likewise approached two other mutual companies, supposed to be in the field for railroad insurance, and ascertained that they would not write the policy insuring tank cars and contents. It attempted no negotiations with the Eastern Syndicate, for the reasons, as Sanford stated, that he was dealing with the Western Syndicate and the two syndicates would not compete directly against one another; that the Eastern Syndicate would not recognize him, and Rambo, its manager

"would do anything"; and that the policy was not desirable as a "naked risk anywhere in the world unless it went as an accommodation line. It takes a big strong firm with a lot of preferential business to go with it in order to get in the front door of consideration and to any underwriter's desk on a line of this nature." Therefore the Western Syndicate, because it already had all the defendants' insurance, was the only underwriter in a practical sense available.

Sanford's assistant, O'Brien, testified for the plaintiff to the same general effect, and said: "We have never gone to the Eastern Syndicate except once and not after that when we were double-crossed. We never went again because we could not trust Mr. Rambo."

On December 29, Sherwin telegraphed the plaintiff: "Have recommended to management first proposal under present form same premium as at present will advise later if accepted."

On January 3, 1931, after receiving authority from the management, he telegraphed to plaintiff: "Satisfactory renew for one year tank car insurance as per present form and premium."

Thereafter the Western Syndicate issued a new tank car policy in all respects like the prior one except that the period it covered was from January 23, 1931–32, instead of January 23, 1930–31. On January 10, 1931, the policy, having been received by the plaintiff, was mailed by it to Sherwin, defendants' insurance commissioner at Dallas, Tex., who received it on January 13. The syndicate's bill for the premium was forwarded by the broker to the railroads at St. Louis, where it remained awaiting payment. On January 21, 1931, eight days after the policy had reached Sherwin, Mr. McGee, the executive vice president of the defendants, telegraphed Sherwin to arrange cancellation of the new policy. The latter, on the same date, telegraphed to the plaintiff: "Arrange cancellation tank car policy * * * issued by Insurance Company of North America effective January twenty-third nineteen thirty one. Answer." Sanford, later in the day, telegraphed to Sherwin that the policy accepted had a noncancellation clause, and he suggested that the matter be held in abeyance until he had opportunity to confer with the Western Syndicate, adding that: "In the meantime it will please me greatly to hear from you to the effect that you had rescinded from your present position." To this Sherwin replied by telegram that the policy

was not effective until January 23, "consequently noncancellation clause not effective until that date. Necessity of reducing expense cause of cancellation of policy."

While these things were going on, one Burns, assistant to the chairman of the board of the railroads, asked Mr. Frank, of Pilcer & Frank, insurance brokers, to get a competitive quotation on the tank car policy which was to expire on January 23, 1931. He proceeded to deal with Rambo, of the Eastern Syndicate, who made an annual rate of $27,500 for the insurance liability covered by both the $600,000 policy and the additional policy for excess coverage on losses over $50,000 from any one fire. Rambo's policy, however, was not noncancellable, nor did it have an "Adjustment of Premium Clause." Moreover, as it was only issued for six months, it would expire in July, and around that date much of the insurance of the railroads, which the plaintiff had procured as broker, and the Western Syndicate was carrying, would become due. Plaintiff argues that these circumstances indicate the truth of Sanford's testimony that the line of insurance desired upon tank cars and contents was only desirable as an accommodation in connection with the general insurance of the railroads, and that the Western Syndicate, because it carried all the defendants' insurance, was the only body of underwriters really available to issue the policy. Sanford, in this connection, testified that Burns had told him Frank, of the brokerage firm that had procured the new insurance, was his lifelong friend, and said: "If he could do anything I (Sanford) was to get the gate." The policy of the Eastern Syndicate was accepted, and, when it expired in July, 1931, that syndicate secured all lines of defendants' insurance.

The insurance policy which plaintiff procured for the year January 23, 1931–32, was not canceled, but the insurance company never sued the railroads for premiums, whether because it thought it had no cause of action or because the two syndicates had members in common and had sufficient identity of interest is immaterial.

The policy which Sanford forwarded to Sherwin was No. 1684 of the Insurance Company of North America. The railroads never paid the premium.

The defendants introduced testimony to show that the Western and Eastern Syndicates were in competition, that Rambo was friendly to the plaintiff, was ready to do business with it if he had been approached, and would have issued the policy he arranged with Frank through the plaintiff. Rambo testified that he issued the policy on its merits, had not in mind securing other insurance from the railroads, and did not issue a policy expiring in six months because of any such motive.

Upon the foregoing record, the court directed the jury to render a special verdict in answer to the following question:

"Did the plaintiff with reasonable diligence discharge its duties and obligations as insurance brokers in obtaining for the defendants Policy No. 1684?"

The jury answered the question in the affirmative, and upon this special verdict the court directed a general verdict for the plaintiff on which the judgment herein was entered.

The material objections urged against the judgment are that:

(1) Policy No. 1684 was rejected before its inception, and therefore no premium became due to the insurance company and no commission to the plaintiff.

(2) The plaintiff acquiesced in the rejection, and therefore could claim no commissions.

(3) The plaintiff failed to disclose that it had not canvassed the Eastern Syndicate, and considered it useless to obtain quotations therefrom for personal reasons.

(4) The exclusion of Exhibits B and D was prejudicial.

■ We do not deem objections 1 and 2 of importance. There was an offer by the railroads to take a policy in the terms which Sherwin outlined when he telegraphed to plaintiff on January 3, 1931: "Satisfactory renew for one year tank car insurance as per present form and premium." This offer was followed by the delivery of exactly that form of policy, which was mailed to Sherwin on January 10, and reached him on January 13, 1931. The only reason that defendants were not in the end satisfied with it was that they were offered a policy by Rambo for less money, though on different terms. But plaintiff had accepted the offer by filling the order, and the contract was performed (Restatement of Contracts, § 52), and it was too late for the defendants to avoid its consequences.

■ But it is said that plaintiff's commissions were to be derived from the premiums and that they were never paid. The only reason,

however, that they were not paid, was that the defendants willfully attempted to cancel the policy and declined to pay for what they had ordered. After the plaintiff had delivered the policy called for, the defendants were bound to pay the commission the broker would have got had the matter taken its normal course.

Objection 3 is likewise unfounded. Whether the plaintiff discharged its duty was a question for the jury. It is true that a broker must do his best to secure favorable rates for his customer and that proper diligence requires canvassing the market. But whether Sanford ought to have sought rates from the Eastern Syndicate, if Rambo's relations with him were very strained and if business experience showed that the Eastern Syndicate would not write the policy unless it could get other business of the defendants, are questions of what, under the particular circumstances, was reasonable diligence and fair conduct on the part of an insurance broker toward his principals. We think they involved the very kind of business problems that a jury was fitted to deal with, and that the trial court left to its decision. The fact that the defendants finally accepted the policy from the Eastern Syndicate at a lower rate than plaintiff had secured was not conclusive proof that the latter was negligent in canvassing the market. The risks under the two policies were very different and a jury might find that a faithful agent would have chosen the Western Syndicate policy for his principals though it was written at a higher premium than the other, and that the policy of the Eastern Syndicate was not accepted on its own merits, but was only a temporary affair issued in connection with the expectation of obtaining all the insurance of the railroads in the near future.

Objection 4 relates to the exclusion of Exhibits B and D. While it might have been safer to admit these letters as tending to show competition between the Western and Eastern Syndicates, yet they related to transactions five years prior to those involved in this action, and their import was not altogether clear. Rambo's testimony on the whole indicates that there were actually some restrictions placed upon competition between the Eastern and Western Syndicates, but that these at times broke down. When Sanford placed defendants' insurance with the Western Syndicate in 1926, it had been with the Eastern Syndicate just before. In January, 1931, Rambo successfully attempted to bring about another shift at the solicitation of Frank. With such evidence of at least sporadic competition, Exhibits B and D were little more than cumulative at best, and the exclusion of them, if prejudicial at all, was not sufficiently so to constitute reversible error.

Judgment affirmed.